JOSEPH WALSH, JOHN J. GLEN, LEWIS MEDKAFF, MORRIS E. WORRALL, WILLIAM F. CONNOLLY, AUGUSTIN WALSH, and IGNATIUS DOMERSKI, *vs*. THE STATE OF DELAWARE.

(*February* 2, 1927.)

RICE and HARRINGTON, J. J., sitting.

*E. Ennalls Berl* for Defendants Below, Plaintiffs in Error.

*Clarence A. Southerland*, Attorney-General, for the State.

Superior Court for New Castle County, No. 84, November Term, 1926.

HARRINGTON, J., delivering the opinion of the court:

The question for us to determine is whether the defendants, or any of them, violated the provisions of *Section* 4784, *Revised Code* 1915, by performing or aiding and abetting in performing any worldly employment, labor or business on Sunday.

This section, in part, provides:

"Whoever shall perform any worldly employment, labor, or business, on the Sabbath day (works of necessity and charity excepted) shall be fined," etc. "Whoever shall be guilty of fishing, fowling, horse racing, cockfighting or hunting game on the Sabbath day shall be fined," etc. "If any number of persons shall assemble to game, play, or dance, on the Sabbath day, and shall engage, or assist, in such game, play, or dance, every such person shall be fined," etc. ..

While acts of this general character were known in the early

days of the Roman Empire, and have apparently been enacted on several occasions during the early, as well as the more recent, periods of English history (37 *Cyc.* 540; *Commonwealth v. Hoover,* 25 *Pa. Super. Ct.* 133), the first act that I have examined was passed by the English Parliament in the twenty-ninth year of the reign of Charles II. *Statutes at Large, vol.* 3, *page* 388, *chapter* 7. That act was entitled "an act for the better observation of the Lord's Day, commonly called Sunday." It forbade "any tradesman, artificer, workman, laborer, or other person to do or exercise on Sunday any worldly labor, business or work *of his ordinary calling,* works of necessity or charity only excepted."

While an act almost identical in its language was passed by the Pennsylvania General Assembly in the year 1705 (*Com. v. Hoover,* 25 *Pa. Super. Ct.* 133; *Com. v. Nesbit,* 34 *Pa.* 403), which presumably applied, also, to what is now the state of Delaware, the first act of this character appearing on our statute books was enacted in the year 1740 during the thirteenth year of the reign of George II. This act was entitled "an act to prevent the breach of the Lord's Day, commonly called Sunday," and is published in *Volume* 1, *Laws of Delaware, Page* 216.

The first section of that act, unlike the English statute, prohibited any "servile" work, labor or business, excepting works of necessity, charity and mercy, but did not contain the restrictive words "of his ordinary calling," appearing in the Act of 29 Charles II. and the early Pennsylvania statute above referred to.

*The Delaware statute of* 1740 was, however, repealed February 3, 1795 and supplied by an act entitled "An act more effectually to prevent the profanation of the Lord's Day, commonly called Sunday." This act is published in *Volume* 2, *Laws of Delaware, at Page* 1209.

*Section* 1 of the Act of 1795 provided:

"If any person  *  *  *  shall do or perform any worldly employment, labor or business  *  *  *  upon the Lord's Day, commonly called Sunday (works of necessity and charity excepted)  *  *  *  shall forfeit," etc.

It therefore omitted the words "servile work" appearing in

the preceding act and substituted therefor the words "wordly employment."

The words "labor or business" remained unchanged. In fact, as was stated in *Hall v. State*, 4 *Harr*. 132, with the exception of the above changes and the omission of certain clauses having no bearing upon this case, practically all of the provisions of the act of 1740 were incorporated in the act of 1795, and it is conceded that the provisions of that statute are substantially the same as *Section* 4784 of the present Code.

The plaintiffs in error, in support of their claim that the record does not show a violation of the statute under which they were convicted, contend (1) that the act of 1795, and consequently the present act, was enacted solely for the purpose of compelling, by legal means, the enforcement of the Fourth Commandment of the Divine Law, providing for the observance of the Lord's Day, and that this commandment merely applied to "servile" work or labor, and not to games, sports or other amusement; (2) that outdoor games and sports are necessary for the preservation of health and therefore come within the exception clause of the statute.

It is true that the Fourth Commandment of the Divine Law provides:

"Remember the Sabbath day to keep it holy. Six days shalt thou *labor* and do all thy *work*; but the seventh day is the Sabbath of the Lord thy God; in it thou shalt not do any *work*, thou, nor thy son, nor thy daughter, thy manservant, nor thy maidservant, nor thy cattle, nor thy stranger that is within thy gates; for in six days the Lord made heaven and earth, the sea, and all that in them is, and *rested* the seventh day; wherefore, the Lord blessed the Sabbath day, and hallowed it." *Exodus*, 20; 8.

It is, also, true that the following passage appears in *Levit*. 23; 7:

"In the first day ye shall have an holy convocation; ye shall do no *servile* work therein."

It is likewise true, as contended by the attorney for the plaintiff in error, that, according to the ancient teachings of the Christian Church, amusements, games and exercise might be indulged in in moderation on Sunday, provided the proper religious observance of the day was not interfered with. Thus it was stated upon the

authority of Ambrose, one of the earliest of the fathers of that church:

"Ordinary hunting is not forbidden as a servile work, and may be moderately indulged in upon the feast day, after assisting at Mass, for the sake of recreation, and this is not a violation of the commandment; it is only when it prevents one's practice of religion, as if on this account attendance at Mass is prevented, or if servants engaged in such occupation are prevented from assisting at Mass or attending to other religious duties."

See, also, *People v. Poole*, 44 *Misc. Rep.* 118, 89 *N. Y. S.* 773.

It might, however, according to the teachings of Augustine, become a profanation of the day, if for the entire day, with great noise and turmoil, hunting was indulged in to the exclusion of meditation upon divine things. The same thing was, also, true of fishing. *Mayol Theologiae Curcus Completus, vol.* 14, *Page* 362.

The same thought was expressed in the works of Thomas Aquinas (*Summa Theologica, vol.* 3, *Page* 672) with an emphasis upon those things which are necessary to the preservation of health:

"It is not against the commandment to eat upon the Sabbath and to do other things of this kind which conserve the health of the body. * * * Similarly, *physical work* which tends to the preservation of the health of one's fellow men, is not violative of the Sabbath. * * *"

All of the above passages quoted from the teachings of the early Christian Church probably antedate the Reformation. Presumably, at a somewhat latter period, *Liguori (Opere* 5, *Page* 384) also said:

"It is not *servile work,* and therefore not prohibited to play games upon Sunday, to dance, to play music, to walk, to ride upon a horse, in a car, or in a boat. * * *"

But while the above references, doubtless, for the most part, translated by the attorney for the plaintiffs in error from the original Latin text, are exceedingly interesting, the teachings of the ancient church do not settle the question before us, as the language of the statute in controversy is much broader than that of the Fourth Commandment.

*Section* 4784 not only prescribes a penalty for the performance of any "worldly labor" but, also, for the performance of any "worldly employment or business" on Sunday. At least, since the

enactment of the act of 1740, our statutes have expressly prohibited fishing, fowling, or hunting game on Sunday. They have also provided for a penalty if any number of persons should assemble to game, play or dance on that day. .

Attention has already been called to the fact that the word "servile," whatever the reason may have been for its insertion originally, does not appear in *Section* 4784, and did not appear in the act of 1795.

The state contends that the plaintiffs in error violated the statute, not because they performed any "worldly labor," but because they either performed or aided and abetted in performing "worldly employment or business" on Sunday.

Chief Justice Booth, in delivering the opinion of the majority of the court, in construing the act of 1795, in *Hall v. State*, 4 *Harr.* 132, said:

> "But as the words of the act of assembly now in force in this state are very extensive in their meaning, it is asked what kind of business was contemplated by the section in prohibiting any worldly employment, labor or business, on the Lord's Day? The answer is, no other than such as openly profanes the sanctity of the day, and violates public order and decorum. The law intended to compel the external observance of the day, by preventing the open show, bustle, and tumult of business. Hence, if a person in the privacy and retirement of his own house, engages in business of a worldly nature on Sunday, he is not amenable to the law, although he incurs the moral guilt of transgressing against the injunctions of religion. The municipal law does not undertake to punish the violation of religious duties, unless the individual by such violation offends against those social duties which, as a member of civil society, he is bound to observe; or unless his evil example is attended with consequences injurious to the community. Therefore, a cook who prepares a dinner on Sunday, a mechanic or merchant who writes a letter of business, or a lawyer who studies his books on that day to prepare a case for argument, although each is engaged in his worldly employment, no one of them is within the prohibition of the act of assembly."

As is contended by the state, Chief Justice Booth evidently intended, in the case above referred to, to distinguish between certain worldly acts mentioned in the statute being carried on openly and in such way as to publicly commercialize and therefore profane the sanctity of the day, and the same acts carried on privately and in the seculsion of a person's own home. He, in substance, stated that while the latter acts might be a violation of a person's religious duties, as prescribed by Divine Laws, they, neverthe-

less, would not come within the prohibition of the statute. That being true, the meaning of the statute in question clearly is not controlled by the construction placed on the Fourth Commandment by the ancient Christian Church, or by any particular religious organization or sect thereof.

Such is the inevitable conclusion from a careful reading of all of the provisions of the statute and the opinion of the Chief Justice in *Hall v. State*. That statutes of this same general character have been enacted from motives of public policy and are purely civil and not religious regulations has also been repeatedly held by the courts of this country. *Levering et al. v. Williams et al.*, 134 *Md.* 48, 106 *A.* 176, 4 *A. L. R.* 374; *Specht v. Commonwealth*, 8 *Pa.* 312, 49 *Am. Dec.* 518; *Commonwealth v. Smith*, 28 *Pa. Dist. R.* 638; 37 *Cyc.* 541.

It appears from the record that Joseph Walsh and John J. Glen on Sunday, October 17, 1926, sold and offered for sale certain tickets of admission to a certain spectacle, commonly called a football game, to which said spectacle the public were invited to purchase tickets of admission, and that the said Lewis Medkaff received said tickets so purchased by the public for admission to the said game.

It is conceded, and we think necessarily so, that as a general rule the playing of a game of football on Sunday for the sole purpose of exercise, recreation or amusement, and without making a business of such game, is not prohibited by the statute; but where the game is commercialized by charging admission fees, and the general public is invited to attend, upon the payment of such fees, a very different situation is presented.

■ As Walsh and Glen offered for sale and sold tickets of admission to such game to the public and Medkaff received and collected the tickets so sold, they clearly did acts justifying their conviction of having performed a wordly employment or business on Sunday.

The rule above announced has been applied under statutes prohibiting worldly business or employment on Sunday to the operation of moving picture theaters and to camp meetings where

admission fees were charged. *Rosenberg v. Arrowsmith*, 82 *N. J. Eq.* 570, 89 *A.* 524; *Commonwealth v. Weidner*, 4 *Pa. Co. Ct. R.* 437. See, also, *State v. Ryan*, 80 *Conn.* 582, 69 *A.* 536; *Capital Theater v. Commonwealth*, 178 *Ky.* 780, 199 *S. W.* 1076; and note to *Levering v. Williams (Md.)*, 4 *A. L. R.* 382, etc.

None of the cases cited by the plaintiffs in error are inconsistent with the conclusion that Walsh, Glen and Medkaff were performing a wordly employment or business on the day in question as none of them involved similar statutes. The statutes involved in *State v. Nashville Baseball Ass'n*, 141 *Tenn.* 456, 211 *S. W.* 357, 4 *A. L. R.* 368, and *Exparte Roquemore*, 60 *Tex. Cr. R.* 282, 131 *S. W.* 1101, 32 *L. R. A. (N. S.)* 1186, were in no sense parallel to our statute, and *St. Louis Agric. & Mechanical Ass'n v. Delano*, 108 *Mo.* 217, 18 *S. W.* 1101, and *Territory v. Davenport*, 17 *N. M.* 214, 124 *P.* 795, 41 *L. R. A. (N. S.)* 407, while baseball cases, merely involved the meaning of the word "labor" which is not necessarily in controversy here.

■ It is true that the statute in question is a penal statue, and must be construed strictly as to the offenses prohibited by it (*Hall v. State*, 4 *Harr.* 132; *Lewis on Sutherland, Statutory Construction*, § 521), but this is merely a rule of construction to be applied in ascertaining its meaning in doubtful cases; considering the broad language of such statute, this rule has no particular application to this case.

■ It further appears from the record that the remaining plaintiffs in error were present aiding and abetting Walsh, Glen and Medkaff in that they were then and there playing the said game of football, well knowing that tickets of admission were being offered for sale and sold to the public.

*Section* 4806, *Rev. Code* 1915, provides:

"Whoever shall abet, procure, command, or counsel any other person, or persons, to commit any crime, or misdemeanor, shall be deemed an accomplice and equally criminal as the principal offender, and shall be punished in the same manner, and with the same punishment."

Worrall, Connolly, Augustin Walsh and Domerski, the persons who were convicted of being accomplices to Joseph Walsh,

Glen and Medkaff, in that they were engaged in playing the game of football in question, contended that their conviction was erroneous because the record contained no statement that they received any pay for participating in such game, and that they were, therefore, in no sense performing worldly labor, employment or business.

Whatever the rule might be, if the statute merely prohibited the performance of worldly labor (*Quarles v. State*, 55 *Ark.* 10, 17 *S. W.* 269, 14 *L. R. A.* 192; *Topeka v. Crawford*, 78 *Kan.* 583, 96 *P.* 862, 17 *L. R. A.* [*N. S.*] 1156, 16 *Ann. Cas.* 403; *Territory v. Davenport*, 17 *N. M.* 214, 124 *P.* 795, 41 *L. R. A.* [*N. S.*] 407; 9 *C. J.* 1102; 4 *A. L. R.* 382, etc.), the business or employment performed or conducted by Walsh, Glen and Medkaff could not have been so performed and conducted without the presence and aid of those who played the game.

It also appearing that these persons knew that tickets of admission to such game were being offered for sale and were being sold to the public, our conclusion is that their conviction is likewise sustained by the record.

Relying on *Commonwealth v. Smith*, 28 *Pa. Dist. R.* 638, the plaintiffs in error further contended, however, that the acts committed by them, even if within the ordinary meaning of the words "worldly business or employment," were also within the exception clause of the statute; physical exercise being essential to the preservation of public health.

Without entering into any discussion as to what acts would ordinarily constitute "works of necessity," it is sufficient to say that the game in question could have been played with as much physical benefit to those concerned in it, if it had not been commercialized and a business or employment created by the charging of admission fees; that it does not come within the exception in the statute is therefore clear.

For the reasons above given, the judgment below is affirmed.