IN THE SUPREME COURT OF THE STATE OF DELAWARE

JERMAINE BOOKER, § 
§ No. 319, 2019
Defendant Below, §
Appellant, §
§
v. § Court Below–Superior Court
§ of the State of Delaware
STATE OF DELAWARE, §
§ Cr. ID No. 1408017638 (N)
Plaintiff Below, §
Appellee. §

Submitted: December 20, 2019
Decided: March 4, 2020

Before **SEITZ**, Chief Justice; **VAUGHN**, and **TRAYNOR**, Justices.

## **ORDER**

Upon consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1) The appellant, Jermaine Booker, appeals the Superior Court's denial of his first motion for postconviction relief under Superior Court Criminal Rule 61 ("Rule 61"). We find no merit to Booker's appeal. Accordingly, we affirm the Superior Court's judgment.

(2) Booker was indicted in September 2014 on charges of attempted first degree murder, possession of a deadly weapon during the commission of a felony ("PDWDCF"), home invasion, first degree robbery, second degree burglary, and misdemeanor theft. The charges arose from two separate incidents that occurred on

November 21, 2013, and January 2, 2014, respectively, at neighboring homes in Wilmington. On November 21, 2013, the unoccupied residence of Drew Van Dyk was burglarized. Several items were taken from Van Dyk's home, including multiple electronic devices, keys to his 1998 Subaru, the owner's manual for the Subaru, and an expired New Jersey license plate. On January 2, 2014, the neighboring home of John Warfield and Jacqueline Fiore was burglarized. Warfield was not home at the time but Fiore was beaten unconscious by the intruder. The attacker fled the scene in Fiore's Lexus.

(3) On January 4, 2014, a New Jersey police officer on patrol in Newark, New Jersey, observed a Lexus lose control and come to an abrupt stop. She saw the two occupants of the vehicle—later identified as Booker and his cousin Kendall Briscoe—exit the vehicle and walk away. The officer ran the New Jersey tag number and learned that the Motor Vehicle Commission had no record of it. When the officer attempted to engage Booker and Briscoe in conversation, the men fled. After giving chase, Booker and Briscoe were apprehended and charged with receiving stolen property and resisting arrest.

(4) A database search of the Lexus's Vehicle Identification Number revealed that the car was linked to a violent crime in Delaware. The car was towed to Delaware and its contents inventoried. Several pieces of circumstantial evidence tied Booker to the two burglaries, among them: (i) the expired New Jersey license

2

plate had been stolen from Van Dyk's garage; (ii) Booker's fingerprint was recovered from the expired New Jersey license plate; (iii) the owner's manual for Van Dyk's Subaru was found in the bushes outside of the Fiore and Warfield residence; (iv) Booker's girlfriend told the police that she and Booker had dinner at Red Lobster in Wilmington on January 2, 2014, and Booker told her he was going to New Jersey to visit Briscoe; (v) surveillance video showed Booker and his girlfriend having dinner and shopping in the vicinity of Red Lobster on January 2, 2014; (vi) EZ-Pass records documented the precise times that the transponder associated with Fiore's Lexus entered and exited the New Jersey Turnpike on January 4, 2014; and (vii) Fiore's blood was found on a pair of green Nike shoes that were recovered from the vehicle.[1] Witnesses vouched for the fact that Briscoe, however, was in New Jersey—not Delaware—on January 2, 2014.[2]

(5)     Following a jury trial in January 2016, Booker was convicted of first degree assault (as a lesser-included offense of attempted first degree murder), home invasion, first degree robbery, second degree burglary, and theft. The Superior Court sentenced Booker to forty-four years of Level V incarceration, followed by

---

[1] Booker's father testified at trial that the shoes were similar to a pair of shoes that he had given Booker for Christmas in 2013.

[2] Booker, himself, admitted Briscoe was not in Delaware during a recorded prison phone call.

decreasing levels of supervision. This Court affirmed Booker's convictions and sentence on direct appeal.[3]

(6) In October 2017, Booker filed a timely *pro se* motion for postconviction relief and a request for the appointment of counsel. The Superior Court granted Booker's motion for appointment of postconviction counsel, and the Office of Conflict Counsel appointed counsel to represent him. Postconviction counsel later moved to withdraw under Rule 61(e)(7), representing that, after a careful review of the record, counsel had not identified any potential grounds for postconviction relief. After considering the motion for postconviction relief, the State's response to the motion for postconviction relief, postconviction counsel's motion to withdraw, Booker's response to postconviction counsel's motion to withdraw, and Booker's reply to the State's response to the motion for postconviction relief, the Superior Court denied Booker's motion for postconviction relief and granted postconviction counsel's motion to withdraw. Booker now appeals to this Court.

(7) On appeal, Booker argues that (i) he was denied effective assistance of counsel because trial counsel (a) failed to introduce Briscoe's prior allegedly inconsistent statements and (b) failed to cross-examine Fiore and introduce into evidence a video recording of her prior exculpatory statement; (ii) postconviction counsel was ineffective for failing to argue that trial counsel was ineffective for

---

[3] *Booker v. State* 2017 WL 3014360 (Del. July 14, 2017).

4

failing to ask for a lesser-included offense instruction for second degree conspiracy; and (iii) the Superior Court committed plain error by failing to instruct the jury on the elements of the lesser-included offense of second degree conspiracy.

(8)　We review the Superior Court's denial of postconviction relief for abuse of discretion and review questions of law *de novo*.[4]  The Court must consider the procedural requirements of Rule 61 before it addresses any substantive issue.[5] Rule 61(i)(3) provides that any ground for relief that was not asserted in the proceedings leading to the judgment of conviction is thereafter barred unless the defendant can establish cause for relief from the procedural default and prejudice from a violation of the defendant's rights.  Rule 61(i)(4) provides that any claim that was previously adjudicated—whether in the proceedings leading to the judgment of conviction, on appeal, in postconviction proceedings, or in a federal habeas corpus proceeding—is thereafter barred.

(9)　Booker's claims of ineffective assistance of counsel are properly raised for the first time in a motion for postconviction relief.[6]  In order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that (i) trial counsel's representation fell below an objective standard of reasonableness, and (ii)

---

[4] *Dawson v. State*, 673 A.2d 1186, 1190 (Del. 1996).

[5] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).

[6] *Malloy v. State*, 2011 WL 1135107, at *2 (Del. Mar. 28, 2011) (citing *Duross v. State*, 494 A.2d 1265, 1267 (Del. 1985).

there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.[7]  Although not insurmountable, there is a strong presumption that counsel's representation was professionally reasonable.[8]

(10)   Booker first claims that defense counsel was ineffective for failing to introduce Briscoe's prior statement to police and prison phone calls because Briscoe did not implicate Booker in those communications.  Because Booker did not raise this argument below, we will not ordinarily entertain it on appeal.[9]  In any event, Booker's claim is unavailing.  Briscoe was an uncooperative witness for the State and his testimony did not implicate Booker.  The State introduced two prison calls made by Briscoe in which he relayed purported admissions Booker made to him regarding the charged crimes.  The record reflects that trial counsel questioned Briscoe about his ability—or inability—to communicate with Booker while in prison, suggesting that Briscoe had fabricated Booker's statements.  Trial counsel also explored Briscoe's possible motivation for manipulating the State for his own self-interest, noting that Briscoe had pending criminal charges and was aware that

---

[7] *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

[8] *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).

[9] Del. Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented."); *Delaware Elec. Coop., Inc. v. Duphily*, 703 A.2d 1202, 1206 (Del. 1997) ("It is a basic tenet of appellate practice that an appellate court reviews only matters considered in the first instance by a trial court.  Parties are not free to advance arguments for the first time on appeal.").

his phone calls were being recorded. "Whether to call a witness, and how to cross-examine those who are called are tactical decisions."[10] A defendant challenging the manner in which counsel conducted cross-examination of a witness has the burden to show (i) precisely what information would have been obtained if counsel had proceeded differently and (ii) how this information would have changed the result.[11] Even assuming that counsel could have presented additional evidence to show that Briscoe had not initially implicated Booker,[12] Booker cannot show that this information would have changed the result. Further evidence of Briscoe's silence on the issue of Booker's guilt would have had little to no impact on the jury's verdict: we have already found that "there was more than sufficient circumstantial evidence to prove that Booker committed" both the November 21, 2013 burglary and the January 2, 2014 home invasion.[13]

(11) Booker next argues, as he did below, that counsel was ineffective for failing to cross-examine Fiore about—and introduce video of—her prior exculpatory

---

[10] *Outten v. State*, 720 A.2d 547, 557 (Del. 1998).

[11] *Id.*

[12] As noted, Briscoe was not a willing witness. On cross-examination, Briscoe stated, "Like what you all want me to say? What do you all want me to tell you all that I can't tell you all? I don't know nothing about nothing, except what I was doing. This is what I keep telling you all. … Look, listen, what I know is what I know. The car was stolen, I got arrested in Newark with my little cousin over there a while ago. He was going about his business, or whatever. I don't know what else – I don't know nothing about no 3rd, no 2nd, no 1st, no nothing…. There ain't nothing else to talk about. I'm not going to answer no questions or nothing. You all already got what you all got out of me." App. to Answering Br. at B23.

[13] *Booker*, 2017 WL 3014360, at *4.

"statement." The record reflects that the chief investigating officer, Sergeant Justin Breslin, unsuccessfully attempted to interview Fiore after the assault on January 2, 2014. At the time, Fiore was hospitalized in the intensive care unit at Christiana Hospital and unresponsive. On January 22, 2014, Sergeant Breslin again tried to obtain information from Fiore, who was still hospitalized and non-verbal. Although she was not able to speak, Fiore responded to some questions posed by Sergeant Breslin by giving a "thumbs up" or "thumbs down." Sergeant Breslin testified at trial that he had the following interaction with Fiore on January 22, 2014:

> I believe the first question was could she hear me, to which she gave a thumbs up.
> The next few questions were basic questions. Is your name Jacqueline? Give me a thumbs up. She gave me a thumbs up.
> The next question would have been, Is your last name Fiore, to which she gave me a thumbs up.
> About the fourth question was, Do you recall what happened to you, to which she gave a thumbs down.
> The next question would be, Do you recall who did this to you, and she gave no reply. There was no response, whatsoever.
> The next question was, I believe, Was the person that attacked you white, to which she replied with a thumbs up.
> The next question was, Was the person black, and she gave no response again.[14]

Not only did the prosecution present the issue of Fiore's "thumbs up" identification to the jury, but trial counsel emphasized this point in his closing argument.[15] Fiore, herself, testified that she did not remember the incident, nor did

---

[14] App. to Opening Br. at A7.
[15] App. to Answering Br. at B24.

8

she recall Sergeant Breslin speaking to her on either January 2 or January 22. Any questioning of Fiore about the "identification" she made on January 22 would have proved pointless. As for Booker's complaint that counsel did not introduce a video recording of Sergeant Breslin's questioning of Fiore on January 22, the record does not reflect that a video was made in the first place.[16] Booker has failed to demonstrate that counsel's decision to not cross-examine Fiore fell below an objectively reasonable standard[17] and has also failed to substantiate an allegation of actual prejudice.

(12) Booker's remaining claims are based on his theory that he was entitled to a jury instruction on second degree conspiracy. Because this argument was not raised below, we ordinarily would not entertain it.[18] Moreover, the claim is procedurally barred by Rule 61(i)(3) because it could have been, but was not, raised on direct appeal and Booker has not—and could not—show cause for relief from the procedural bar. Nevertheless, the argument is without merit. There was no legal basis to support the Superior Court instructing the jury on second degree conspiracy. Booker was not charged with conspiracy. The charge of conspiracy is a separate

---

[16] We imagine if a video of the severely incapacitated victim did exist, it would be highly inflammatory.

[17] The Superior Court noted that any rational defense counsel would not have wanted to prolong Fiore's time on the witness stand in light of the severity of her injuries, from which she still suffered acute pain at trial.

[18] *Supra*, n. 9.

9

offense and requires proof of different elements than those elements in the principal crime.[19]  A conspiracy charge is not a lesser-included offense of the principal offense.[20]  In his reply brief, Booker asserts that second degree conspiracy is a lesser included offense for all Class B felonies.  This allegation simply has no merit.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ Collins J. Seitz, Jr.*
Chief Justice

---

[19] *Steele v. State*, 151 A.2d 127, 130 (Del. 1959).
[20] *See id.*

10